RUSSO & TONER, LLP
Attorneys for Plaintiff
33 Whitehall Street, 16th Floor
New York, New York 10004
Tel.: 212-482-0001
JOSH H. KARDISCH, ESQ.
JHK-4771
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

DANIEL MOORE,                                                    Civ. Action No.:

                                    Plaintiff,          **VERIFIED
                                                         COMPLAINT**

            -against-

THOMSON REUTERS (GRC) INC.,

                                    Defendant.

-----------------------------------------------------------------------X

Plaintiff, **DANIEL MOORE**, by and through his attorneys, RUSSO & TONER,

LLP, complaining of defendant, respectfully alleges as follows:

## THE PARTIES

1.      Plaintiff DANIEL MOORE resides at 1100 Maxwell Lane, Unit 531, in

the City of Hoboken, State of New Jersey.

2.      Upon information and belief and at all times relevant herein, THOMSON

REUTERS (GRC) INC. ("THOMSON REUTERS"), was and is a foreign corporation,

duly formed, organized and existing under the laws of the State of Delaware.

3.      Upon information and belief and at all times relevant herein, THOMSON

REUTERS was and is a domestic corporation duly formed, organized and existing under the laws of the State of New York.

4.      Upon information and belief and at all times relevant herein, THOMSON REUTERS maintained and maintains an office for the principal place of business at 3 Times Square, in the City of New York, State of New York.

## STATEMENT PURSUANT TO LOCAL RULE 9

5.      Plaintiff has no corporate parent, subsidiary or affiliate, and there are no other interested parties.

## JURISDICTION

6.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000 and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

## VENUE

7.      Venue is proper pursuant to 28 U.S.C. §1391 in that defendant resides in the Southern District of New York and is a resident of the State in which the district is located.

## FACTS COMMON TO ALL COUNTS

8.      Plaintiff repeats and re-alleges the statements contained in paragraphs "1" through "7" above with the same force and effect as if fully set forth herein.

9.     In or about June, 2010, Plaintiff DANIEL MOORE commenced employment with Pricing Partners SAS as a Senior Vice President-Sales in that company's United Kingdom office.

10.     At all times relevant herein, Pricing Partners was involved in the financial industry market, specifically in front office trading, quantitative research, risk control, risk management, structuring, and front office IT, as a developer and provider of over-the-counter derivative pricing analytics software and a service provider of independent valuation for all derivatives.

11.     Pricing Partners' flagship products were "Price-it® Online," an internet based, SaaS mode valuation platform for hard-to-value over-the-counter derivatives and sophisticated structured products, and "Price-it® Excel, a locally-installed, state of the art Excel add-in which provides all of the mathematical models needed to enable users to price and risk manage any over-the-counter derivative regardless of its complexity from their workstations.

12.     Pricing Partners also provided a C++ API with which users could connect the Price-it®Excel solution to other existing systems within their infrastructure.

13.     Additionally, Pricing Partners provided a solution called Price-it®Source Code which enabled users to access the Source Code of the mathematical models and numerical methods in order to greatly enhance their programming capabilities when building out their internal model libraries.

14.     Pricing Partners paid Plaintiff at a rate of 90,000 GBP per annum plus ten (10%) percent for any new business he generated and five (5%) percent for renewal business in perpetuity and with no limitations (i.e., "uncapped.")

15.     In 2013, Pricing Partners became part of THOMSON REUTERS.

16.     Defendant retained the "Pricing Partners" identity, advertising the entity as "part of Thomson Reuters, an international software developer of OTC derivative pricing analytics and a service provider of independent valuations for all derivatives ranging from vanilla to the most complex exotic and hybrid structures, as well as proprietary algorithmic indexes."

17.     Defendant THOMSON REUTERS acquired Pricing Partners and retained its identity so that it could "combine (its) industry-leading over-the-counter derivatives position with the brand reputation, scale and broad capabilities of Thomson Reuters Pricing Service."

18.     Insofar as Defendant maintained the Pricing Partners identity and the business activities carried on after the transfer were fundamentally the same as the activities which Plaintiff had previously carried out, Plaintiff came within and is under the protection of the Transfer of Undertakings (Protection of Employment) Regulations of 2006 ("TUPE") and the Collective Redundancies and Transfer of Undertakings (Protection of Employment) (Amendment) Regulations of 2014 ("the 2014 Regulations").

19.     On April 16, 2014, Defendant THOMSON REUTERS extended a written offer of employment ("the Offer") to Plaintiff to become a Sales Specialist.

20.     The employment which Defendant offered was "based in New York," and required Plaintiff to report to the Offer's author, Sales Specialist Manager, Enterprise Content, Scott Kaffl, and relocate his family and himself from the United Kingdom to the New York area.

21.     The Offer promised compensation at a bi-weekly (per pay period) rate of $5,961.54 United States dollars (annualized rate of $155,000.00 United States dollars).

22.     The Offer also promised that Plaintiff would be eligible to participate in the Defendant's Sales Incentive Plan ("SIP"), with an On Target Variable Earnings ("OTVE") of $62,000 United Stated dollars per annum.

23.     The OTVE was based upon Plaintiff achieving 100% of management by objectives ("MBO'S") that a manager would establish, prorated based upon the employment inception date.

24.     The Offer promised that Plaintiff would be eligible to participate in the Defendant's 401(k) Savings Plan and Employee Stock Purchase Plan.

25.     During the negotiation process, Pricing Partners' Chief Executive Officer, Dr. Eric Ben-Hamou, represented to Plaintiff in a face-to-face meeting that accepting the Offer would be a positive step in Plaintiff's career.

26.     Dr. Ben-Hamou exerted pressure on Plaintiff to accept the transfer to New

York, stating that if he stayed in the United Kingdom, his tenure with Defendant might be in jeopardy.

27.     Defendant's representatives met with Plaintiff on a weekly basis before the latter accepted the Offer to reiterate the advisability of accepting the transfer to New York and the possibility that if he did not do so, he may no longer have a position with THOMSON REUTERS.

28.     In addition, Sales Specialist Manager, Enterprise Content, Scott Kaffl, represented that Plaintiff would act as a consultant for Defendant during the last quarter of 2014 and that he would become a Sales Specialist per the Offer beginning in 2015.

29.     Defendant represented that it would take all steps necessary to support the products that Plaintiff would be trying to sell.

30.     Defendant also represented that Plaintiff would be the only THOMSON REUTERS representative in the United States who would be selling those products.

31.     In addition, Defendant represented that Plaintiff would be able to earn uncapped commissions for all of the deals that he closed.

32.     Defendant advertised and advertises Price-it® Online as a product which guarantees access to each stage of the valuation process, as well as total transparency to complement THOMSON REUTERS' DataScope Select, and that it is "supported by Pricing Partners' technology and a substantial quantitative financial library."

33.     On the basis of the aforementioned representations, Plaintiff DANIEL MOORE accepted the Offer by executing it on July 24, 2014.

34.     On the basis of the aforementioned representations, Plaintiff signed a TUPE Agreement on August 7, 2014.

35.     On the basis of the aforementioned representations, Plaintiff and his family relocated to the New York area in September, 2014 so that Plaintiff could work out of the Defendant's New York office.

36.     Prior to accepting the position in New York with Defendant company, Plaintiff had generated at least seven (7) multi-year business transactions for Pricing Partners from which he was receiving commissions and for which he was entitled to ongoing commissions in perpetuity, and he had several additional transactions pending.

37.     Sometime after Plaintiff accepted the position with THOMSON REUTERS, Defendant advised him that the SIP-OTVE would be capped at One Hundred and Twenty-Five (125%) percent.

38.     For most of his tenure with THOMSON REUTERS, Plaintiff reported to the aforementioned Scott Kaffl.

39.     Between the third quarter of 2015 and September 12, 2016, Plaintiff reported to Defendant's Glenn Strier.

40.     Between September and December 2014, Plaintiff acted as a consultant for Defendant company.

41.    In his consultant capacity and in the process of training sales people as well as account managers on how to sell over-the-counter derivative valuation solutions, Plaintiff ascertained and recognized that Defendant was not supporting the products that the company was selling.

42.    Specifically, Plaintiff determined that Price-it® Online and Price-it® Excel, both of which Pricing Partners was able to support in the United Kingdom, were incapable of being supported in the United States for a variety of technical reasons, and that the C++ API's and the Price-it® Source Code solution was not being supported any longer in any territory.

43.    In 2015, Defendant continued to maintain DANIEL MOORE in the position of consultant rather than in the Sales Specialist position which it had offered him.

44.    Plaintiff inquired several times during the course of 2015 and 2016 as to why he was not working in the capacity of Sales Specialist.

45.    Defendant responded to the afore-mentioned inquiries by stating that since the products were not yet supported, Plaintiff would not be able to achieve his quota and, therefore, should remain a consultant.

46.    Plaintiff voluntarily ended his employment with Defendant on September 12, 2016.

## AS AND FOR A FIRST CAUSE OF ACTION, PLAINTIFF ALLEGES AS FOLLOWS:
### (Breach of Contract)

47.     Plaintiff repeats and re-alleges the statements contained in paragraphs "1" through "47" above with the same force and effect as if fully set forth herein.

48.     Defendant's aforementioned Offer and Plaintiff's acceptance of said Offer created a binding and enforceable contract between the parties.

49.     The parties mutually assented to all terms of the aforementioned contract.

49.     Plaintiff fully performed under the contract by leaving his employment in the United Kingdom and undertaking all aspects and responsibilities of his employment with Defendant in New York.

50.     Plaintiff tendered good and valuable consideration in the contractual process.

51.     Defendant failed and, in fact, refused to perform pursuant to the parties' agreement and, accordingly, materially breached said agreement.

53.     Because of their failures and refusals as aforementioned, Plaintiff sustained and continues to sustain significant financial harm.

54.     As a direct and proximate result of the aforementioned material misrepresentations, Plaintiff was caused to suffer financial harm in an amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction and which will be proved through discovery, including but not limited to

the differences in compensation between what he was earning in the United Kingdom and what he earned in the United States, commissions on sales which he made while in the United Kingdom. commissions in perpetuity on sales which were pending as of August 2014, actual and compensatory damages he suffered, continues to suffer, and will suffer in perpetuity, and all costs associated with recovering said amounts in this action, including compensatory damages in an amount to be established at trial together with interest and all other damages that plaintiff may prove as allowed by law.

## AS AND FOR A SECOND CAUSE OF ACTION, PLAINTIFF ALLEGES AS FOLLOWS: (Breach of the Covenant of Good Faith and Fair Dealing)

55.     Plaintiff repeats and re-alleges the statements contained in paragraphs "1" through "54" above with the same force and effect as if fully set forth herein.

56.     At all times relevant herein, the parties were obligated to act in good faith and to fairly deal with one another.

57.     At all times relevant herein, the parties were obligated to do nothing which would have the effect of destroying the rights of the other to receive the fruits of the contract.

58.     At all times relevant herein, the aforementioned obligations were consistent with the parties' contractual relationship.

59.     At all times relevant herein, the aforementioned obligations encompassed any promises which a reasonable person in the position of promise

would be justified in understanding were included.

60.     By conducting itself as aforementioned, Defendant failed to exercise good faith and fair dealing in fulfilling the terms and promises of the offer, the agreement and the relationship between the parties.

61.     By conducting itself as aforementioned, Defendant breached its duty to exercise good faith and fair dealing in fulfilling the terms and promises of the offer, the agreement and the relationship between the parties.

62.     As a direct and proximate result of the aforementioned, Plaintiff was caused to suffer financial harm in an amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction and which will be proved through discovery, including but not limited to the differences in compensation between what he was earning in the United Kingdom and what he earned in the United States, commissions on sales which he made while in the United Kingdom. commissions in perpetuity on sales which were pending as of August 2014, actual and compensatory damages he suffered, continues to suffer, and will suffer in perpetuity, and all costs associated with recovering said amounts in this action, including compensatory damages in an amount to be established at trial together with interest and all other damages that plaintiff may prove as allowed by law.

## AS AND FOR A THIRD CAUSE OF ACTION,
## PLAINTIFF ALLEGES AS FOLLOWS:
### (Fraud and Deceit)

63.    Plaintiff repeats and re-alleges the statements contained in paragraphs "1" through "62" above with the same force and effect as if fully set forth herein.

64.    During the negotiation process, Pricing Partners' Chief Executive Officer, Dr. Eric Ben-Hamou, represented to Plaintiff in a face-to-face meeting that accepting Defendant's Offer would be a positive step in Plaintiff's career.

65.    During the negotiation process, Defendant's representatives met with Plaintiff on a weekly basis and misrepresented the advisability of Plaintiff accepting the transfer to New York.

66.    During the negotiation process, Defendant's Sales Specialist Manager, Enterprise Content, Scott Kaffl, misrepresented to Plaintiff that he would become a Sales Specialist per the Offer beginning in 2015.

67.    Before Plaintiff accepted Defendant's Offer, Defendant misrepresented that it would take all steps necessary to support the products that Plaintiff would be trying to sell, several examples of which were Price-it® Online, Price-it® Excel, the C++ API's and the Price-it® Source Code solution, when in fact, it was not capable of doing so in the United States.

68.    Before Plaintiff accepted Defendant's Offer, Defendant misrepresented

that Plaintiff would be the only THOMSON REUTERS representative in the United States who would be selling those products.

69.     Before Plaintiff accepted Defendant's Offer, Defendant misrepresented that Plaintiff would be able to earn uncapped commissions for all of the deals that he closed.

70.     Defendant's representations as aforesaid were representations of fact.

71.     Defendant's representations as aforesaid were materially false or were material omissions of fact.

72.     When Defendant made the aforementioned representations, it knew they were false.

73.     In the alternative, when Defendant made the aforementioned representations, it did so recklessly and without regard to whether they were true or false.

74.     Defendant made the aforementioned misrepresentations in order to induce Plaintiff to leave his employment in the United Kingdom in favor of accepting employment as a Sales Specialist in and moving his family to New York.

75.     Plaintiff justifiably relied upon the representations as aforesaid.

76.     In justifiable reliance on the aforementioned representations, Plaintiff DANIEL MOORE accepted the Offer, signed a TUPE Agreement, and relocated his family and himself to the New York area.

77.     As a direct and proximate result of the aforementioned material misrepresentations, Plaintiff was caused to suffer financial harm in an amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction and which will be proved through discovery, including but not limited to compensatory damages, pecuniary loss, differences in compensation between what he was earning in the United Kingdom and what he earned in the United States, commissions on sales which he made while in the United Kingdom, commissions in perpetuity on sales which were pending as of August 2014, actual and compensatory damages he suffered, continues to suffer, and will suffer in perpetuity, loss in benefits, and attorneys' fees and costs associated with recovering said amounts in this action, together with interest and all other damages that plaintiff may prove as allowed by law.

## AS AND FOR A THIRD CAUSE OF ACTION,
## PLAINTIFF ALLEGES AS FOLLOWS:
### (Intentional Infliction of Emotional Distress)

78.     Plaintiff repeats and re-alleges the statements contained in paragraphs "1" through "77" above with the same force and effect as if fully set forth herein.

79.     Defendant's actions as aforementioned constitutes extreme and outrageous conduct.

80.     Defendant conducted itself in the aforementioned manner with intent to cause or with disregard of a substantial probability of causing, severe emotional distress to Plaintiff

81.    Defendant's conduct as aforementioned directly and proximately caused

Plaintiff to suffer severe emotional distress.

82.    As a direct and proximate result of the aforementioned conduct, Plaintiff

suffered damages in an amount to be determined by the Court or a jury at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION, PLAINTIFF ALLEGES AS FOLLOWS: (Negligent Infliction of Emotional Distress)

83.    Plaintiff repeats and re-alleges the statements contained in paragraphs "1"

through "82" above with the same force and effect as if fully set forth herein.

84.    Defendant's actions as aforementioned constitutes extreme and

outrageous.

85.    Defendant conducted itself in the aforementioned manner with intent to

cause or with disregard of a substantial probability of causing, severe emotional

distress to Plaintiff

86.    As a direct and proximate cause of Defendant's acts and omissions as

Aforesaid, Plaintiff suffered severe emotional distress and harm.

87.    As a direct and proximate result of the aforementioned conduct, Plaintiff

suffered damages in an amount to be determined by the Court or a jury at trial.

## STATEMENT REGARDING INTENT TO SEEK PUNITIVE DAMAGES

While not pleading punitive damages as a separate cause of action, Plaintiff

puts Defendant on notice that its acts and omissions were wanton and reckless and evidence a disregard of Plaintiff's rights and that Plaintiff will request punitive damages to punish Defendant and deter others from similar conduct.

## RESERVATION OF RIGHTS

Plaintiff reserves the right to amend this Verified Complaint pursuant to the CPLR or Order of the Court

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues.

**WHEREFORE,** Plaintiff **DANIEL MOORE**, hereby demands judgment against Defendant, as follows:

**On the First Cause of Action**, the sum of $500,000, together with interest, costs and disbursements;

**On the Second Cause of Action**, the sum of $500,000, together with interest, costs and disbursements;

**On the Third Cause of Action**, the sum of $500,000, together with interest, costs and disbursements.

**On the Fourth Cause of Action**, the sum of $500,000, together with interest, costs and disbursements.

Dated: New York, New York
        December 30, 2016

RUSSO & TONER, LLP

By: _____

JOSH H. KARDISCH, ESQ.
Attorneys for Plaintiff
33 Whitehall Street, 16th Floor
New York, New York 10004
Tel.: (212) 482-0001
Fax: (212) 482-0002

To:   Deirdre Stanley
    Executive Vice President, General Counsel
    Thomson Reuters
    3 Times Square
    New York, New York 10036

## **ATTORNEY'S VERIFICATION**

**JOSH H. KARDISCH**, an attorney, admitted to practice in the Courts of the State of New York and the United States District Court for the Southern District of New York, affirms the following to be true under the penalties of perjury:

Your Affirmant has read the foregoing Complaint and knows the contents to be true upon information and belief.

The source of the Affirmant's information is investigation, review of the records contained in his file and consultations with plaintiff herein.

This Verification is made by your Affirmant because the plaintiff is not a resident of the county where your Affirmant maintains his office.

Dated:     New York, NY
            January 11, 2016

                                                                  JOSH H. KARDISCH, ESQ.